IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

UNITED STATES OF AMERICA              PLAINTIFF

v.      Case No. 2:24-cr-00018-KGB

PERCY JACKSON                   DEFENDANT

## ORDER

Pending is defendant Percy Jackson's motion to suppress (Dkt. No. 23).  Mr. Jackson seeks to suppress all physical evidence obtained from law enforcement's search of a Nissan Sentra near Southland Gaming Casino in West Memphis, Arkansas, on October 10, 2023 (*Id.*).  The United States of America ("Government") responded in opposition to the motion (Dkt. No. 27).  The Court conducted a hearing on the motion on May 28, 2025, at which Mr. Jackson, his counsel, and counsel for the Government were present.  The Court received evidence and testimony, and heard argument, at the hearing.  For the following reasons, the Court denies the motion to suppress (Dkt. No. 23).

    I.    **Factual Background**

At the hearing on the motion to suppress, Agent Jarius Johnson ("Agent Johnson") of the West Memphis, Arkansas, Police Department's ("WMPD") drug task force took the stand, was sworn, and testified as follows.

As of October 2023, Agent Johnson had been employed at the WMPD for approximately three years.  He attended the law enforcement training academy in 2020.  Agent Johnson started out as a patrol officer, moved on to the WMPD's violent crimes suppression unit ("VCSU"), and then moved on to the WMPD's interdiction unit working with the drug task force.  At the time of

the incident, Agent Johnson was a member of the VCSU, which investigates stolen vehicles, stolen guns, and violent crimes.

Since 2020, Agent Johnson has received specialized training for interdicting vehicles and for the WMPD's special response team. As of October 2023, Agent Johnson had performed thousands of traffic stops.

On October 10, 2023, Agent Johnson initiated a traffic stop of a 2014 white Nissan Sentra ("the Sentra"). Agent Johnson initiated the traffic stop because he noticed that the Sentra was driving with expired Tennessee vehicle registration tags (Dkt. No. 27-1, at 4). He also noticed that the Sentra's passenger side brake light was out (*Id.*). Agent Johnson testified that the Sentra did not pull over immediately when he put on his lights and sirens. Instead, Agent Johnson testified that the Sentra sped up and did not come to a complete stop at a stop sign. He noticed the squealing of the tires from the Sentra speeding up. Agent Johnson did not recall at precisely which point he turned on his lights and sirens. The Sentra subsequently pulled over in the back parking lot of Southland Gaming Casino (*Id.*).

Before getting out of his police unit, Agent Johnson ran the Sentra's vehicle tags. Dispatch informed Agent Johnson that the tags returned to a different vehicle, a Chevrolet Equinox. Agent Johnson then left his police unit and made contact with the driver of the Sentra. The driver provided Agent Johnson with a state identification card. Although the document from Tennessee said "driver's license" on it, Agent Johnson was able to determine that the document was not a valid driver's license because of the number of zeroes on the identification card and because it was a printed-off card rather than the actual physical copy. Agent Johnson used the identification card to identify the driver as Mr. Jackson. Agent Johnson ran Mr. Jackson's information through ACIC/NCIC via dispatch, and he "returned valid" (Dkt. No. 27-1, at 4).

After obtaining Mr. Jackson's identification, Agent Johnson asked Mr. Jackson to step out of his vehicle so that Agent Johnson could talk to him, away from the loud music.  Mr. Jackson consented and exited the vehicle.  When Mr. Jackson exited the vehicle, Agent Johnson observed that Mr. Jackson had only one shoe on.  Agent Johnson then asked for consent to search Mr. Jackson's person.  Mr. Jackson again consented, and a search of his person found nothing.

Agent Johnson then asked Mr. Jackson for consent to search the Sentra.  Mr. Jackson denied consent to search the Sentra.  At this point, Agent Johnson observed that Mr. Jackson exhibited nervousness in the form of a lack of eye contact and a quivering voice.  He also observed that, in response to the request to search the Sentra, Mr. Jackson made a facial expression, flailed his arms out to the side, and began "overly explaining" that he needed to pick up someone.  Agent Johnson found these latter behaviors to be defensive and summed them up in his report by stating that Mr. Jackson "attempted to become verbally aggressive" (Dkt. No. 27-1, at 4).  Agent Johnson then walked away from Mr. Jackson and asked via radio for a K9.

After radioing for a K9, Agent Johnson returned and told Mr. Jackson that he had called for a K9 and that Mr. Jackson would have to stand by until the K9 arrived.  Agent Johnson then proceeded to fill out a contact sheet and a written warning for Mr. Jackson.  Agent Johnson testified that a contact sheet collects basic information about the person and, at the time of the stop, was a routine part of traffic stops performed by WMPD.  Agent Johnson further testified that the traffic stop would not have been completed until Agent Johnson passed back Mr. Jackson's identification card with the written warning and advised Mr. Jackson of how to get his vehicle tags.

The K9 arrived approximately 13 minutes after Agent Johnson submitted a request for a K9.  Agent Johnson was about halfway finished filling out the contact sheet when the K9 arrived and had not yet given the written warning to Mr. Jackson.  Once the K9 arrived, an open-air dog

3

sniff test was conducted, and the dog alerted on the Sentra.  Agent Johnson saw the dog alert.  Agent Johnson advised Mr. Jackson that the dog had alerted and began to search the Sentra (Dkt. No. 27-1, at 4).  Inside the Sentra, Agent Johnson's arrest report indicates that he and assisting officers found:  (1) a receipt paper of marijuana weighing approximately 2.63 grams on the driver side; (2) a silver and black colored Ruger P89DC, serial #310-66257, with a chamber round and 11 magazine rounds under the driver seat; and (3) a brown bag in the passenger side glove compartment containing 38.6 grams of Fentanyl pressed pills in a clear plastic bag, along with other pills that field tested positive for Amphetamine (Dkt. No. 27-1, at 4).

The entire period between the time the Sentra pulled over and when the dog alerted was roughly 15 minutes in total.  Agent Johnson requested a K9 at approximately 4:52 p.m., about three minutes after the Sentra pulled over.  The K9 arrived, and the dog alerted, at approximately 5:04 p.m.

## II.    Legal Standard

"The exclusionary rule is a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *United States v. Reed*, 978 F.3d 538, 541 (8th Cir. 2020) (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)).  "The rule applies to deter future unlawful police conduct." *Id.*  It is best understood as a judicially created supplement to the text of the Fourth Amendment, which is silent as to its enforcement. *Davis*, 564 U.S. at 231.

The Fourth Amendment itself protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  "A traffic stop is a reasonable seizure if it is supported by probable cause or reasonable suspicion of criminal activity." *United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir.), *cert. denied*, 143 S. Ct. 2623 (2023).

Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)). "The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Glover*, 589 U.S. at 380). Law enforcement officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Courts look to the "totality of the circumstances" in determining whether reasonable suspicion existed. *Id.* Moreover, because the Fourth Amendment carries an objective standard, reasonable suspicion is "not dependent on an [] officer's subjective belief." *See United States v. Torres-Lona*, 491 F.3d 750, 756 (8th Cir. 2007).

Expired vehicle registration is a valid basis for a traffic stop. *Brown*, 60 F.4th at 1182. However, a traffic stop justified only by a police-observed traffic violation "'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Tasks for which an officer may reasonably extend a traffic stop include "running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their 'destination, route, and purpose.'" *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v.*

5

*Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008), *overruled abrogated on other grounds by Rodriguez*, 575 U.S. at 348). The ultimate constitutional reasonableness of a traffic stop depends on its objective reasonableness, not the "actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996).

An exterior dog sniff of a vehicle is not a search for Fourth Amendment purposes. *United States v. Grant*, 696 F.3d 780, 784 (8th Cir. 2012). As such, "a law enforcement officer need not obtain consent to conduct a dog sniff during an otherwise lawful encounter." *Id.* However, for purposes of extending a traffic stop, "a dog sniff . . . is not an ordinary incident of a traffic stop," and therefore requires independent reasonable suspicion if conducting the dog sniff unnecessarily extends the length of the traffic stop. *Rodriguez*, 575 U.S. at 356. Notably in this regard, "[a]n officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered," such that reasonable suspicion may arise to extend the seizure during the course of an unrelated traffic stop. *Murillo-Salgado*, 854 F.3d at 415 (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)).

**III.    Discussion**

In his motion to suppress, Mr. Jackson argues that Agent Johnson and other officers present at the scene illegally prolonged the traffic stop to conduct an unrelated investigation of possible illegal activity as to the Sentra (Dkt. No. 23, at 2–3). At the hearing on the instant motion, counsel for Mr. Jackson stated that Mr. Jackson does not contest the validity of the traffic stop or that Mr. Jackson's registration tags were expired. However, Mr. Jackson's counsel offered oral argument that Mr. Jackson was illegally seized once he was informed by Agent Johnson that he would have to wait until the K9 arrived. In response, the Government argues that the dog sniff did not prolong the traffic stop and that, even if it did, Agent Johnson had developed a reasonable suspicion of

6

criminal activity sufficient to prolong the stop in order to carry out the dog sniff (Dkt. No. 27, at 3–5).

The Court finds on the record before it that the dog sniff did not prolong the traffic stop and thus did not result in a separate Fourth Amendment seizure of Mr. Jackson as would require reasonable suspicion of criminal activity apart from the traffic violations for which Mr. Jackson was originally stopped.  The Government has offered uncontroverted evidence that:  (1) the K9 arrived and the dog sniff was performed before Agent Johnson was able to finish filling out the contact sheet and written warning for the traffic stop; and (2) filling out the contact sheet and written warning were routine aspects of traffic stops performed by WMPD at the time of the stop. A video of the traffic stop was played at the hearing.  There is no allegation or evidence suggesting that Agent Johnson or any other officer deliberately delayed or slow-walked any of the tasks related to the traffic stop, or prolonged the stop with extensive questioning about unrelated topics, *see United States v. Peralez*, 526 F.3d at 1121, so that the K9 would arrive before the tasks related to the traffic stop were completed.

Although it is true that Agent Johnson recalled telling Mr. Jackson that he would have to stand by until the K9 arrived, uncontroverted evidence shows that the arrival of the K9 objectively did not result in any delay of, and did not prolong, the traffic stop.  Indeed, Agent Johnson was only halfway finished filling out the contact sheet when the K9 arrived and the dog sniff was conducted.  It is well settled that "[t]he test for whether a person has been 'seized' within the meaning of the Fourth Amendment is an 'objective standard.'"  *United States v. Lozano*, 916 F.3d 726, 730 (8th Cir. 2019) (quoting *Grant*, 696 F.3d at 784).  Simply put, the traffic stop, objectively speaking, had not yet ended at the time the dog sniff was conducted because the tasks related to the traffic stop had not yet been completed.  Whether or not Mr. Jackson—or the officers on the

7

scene, for that matter—subjectively believed that Mr. Jackson was being detained for purposes of conducting a dog sniff is legally irrelevant, given that the dog sniff occurred in the context of a valid traffic stop and that the conducting of the dog sniff did not objectively prolong the traffic stop.  This is because, as the Court has already noted, the open-air dog sniff of the Sentra was not a "search" or "seizure" for Fourth Amendment purposes and thus has no independent legal significance unless Mr. Jackson was unnecessarily detained.  *See Grant*, 696 F.3d at 784.

Even if the traffic stop had been prolonged, which the Court concludes the stop was not based on the record before the Court, Agent Johnson had reasonable suspicion to prolong the stop to conduct a dog sniff.  By the time Agent Johnson called for a K9, he had already made the following observations with respect to Mr. Jackson:  (1) Mr. Jackson appeared initially to speed up prior to the stop when he observed Agent Johnson's police unit; (2) the Sentra had expired registration tags and a broken brake light; (3) the Sentra's expired tags returned to a different vehicle; (4) Mr. Jackson was not carrying a valid driver's license; (5) Mr. Jackson was wearing only one shoe and was exhibiting signs of nervousness such as a quivering voice and lack of eye contact; and (6) Mr. Jackson reacted defensively when asked for consent to search the Sentra by making a facial expression, flailing his arms to the side, and offering unprompted explanations as to what he was doing.  These factors were sufficient to give Agent Johnson, who had conducted thousands of traffic stops and received various specialized trainings, an objectively reasonable suspicion that criminal activity was afoot so as to warrant a brief prolongation of the traffic stop to conduct a dog sniff.  The Court notes that other courts have found reasonable suspicion in similar circumstances.  *See Murillo-Salgado*, 854 F.3d at 415–16; *United States v. Chacon*, 701 F. Supp. 3d 821, 827 (S.D. Iowa 2023), *aff'd sub nom. United States v. Munoz*, 134 F.4th 539 (8th Cir. 2025).

For these reasons, the Court understands Mr. Jackson does not challenge the initial stop, and the Court finds that Agent Johnson and the other officers on the scene were legally entitled to conduct a dog sniff of the Sentra and that, once the dog alerted on the Sentra, the officers had probable cause to conduct a warrantless search of the Sentra. There was no Fourth Amendment violation as to Mr. Jackson.

**IV.     Conclusion**

For the foregoing reasons, the Court denies Mr. Jackson's motion to suppress (Dkt. No. 23).

It is so ordered this 3rd day of July, 2025.

*Kristine G. Baker*
Kristine G. Baker
Chief United States District Judge